# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

SCOTT NJOS,

              Plaintiff,

      v.

CARNEY, et al.,

              Defendants

CIVIL ACTION NO. 3:12-CV-01375

(KOSIK, J.)
(MEHALCHICK, M.J.)

## REPORT AND RECOMMENDATION

This is a prisoner civil rights action. In his complaint, *pro se* plaintiff Scott Njos, an inmate at United States Penitentiary Lewisburg in Union County, Pennsylvania, has asserted a *Bivens*[1] claim against three chaplains at the prison, defendants Carney, Onuh, and Davis.[2] In particular, Njos claims that the chaplains have placed a substantial burden on the exercise of his religious beliefs by denying him access to kosher meals and by providing him with inadequate amounts of Sabbath juice and matzo, in violation of the First Amendment to the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1. The Defendants have filed a motion to dismiss and for summary judgment pursuant to Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure. (Doc. 21). For the reasons stated herein, it is recommended that the motion be denied.

### I.  BACKGROUND

The material facts of this case are largely, but not entirely, undisputed.

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[2] The chaplain defendants are referenced in the complaint and other papers by their surnames only.

Scott Njos is a federal inmate incarcerated at USP Lewisburg. He arrived there from another federal correctional facility on October 18, 2010. At the time of his arrival at USP Lewisburg, Njos's religious preference had been designated as Jewish. Njos subsequently changed his religious designation on multiple occasions while at USP Lewisburg, from Jewish to Pagan, then back to Jewish, then to Muslim, and then back to Jewish. Njos claims that he did so to gain access to the religious literature of other religions and in an attempt to circumvent restrictions that excluded him from participating in the certified religious diet program, but that he remained a sincere adherent to the Jewish religion throughout.

Shortly after his arrival at USP Lewisburg, Njos requested and was placed on the "certified religious diet program," also known as "common fare." By way of background,

> The BOP [has] developed a cost-effective plan designed to accommodate all of the estimated thirty-one religious groups represented in the prison system. The BOP offers two meal plans, the "main line" and the "Common Fare." The main line contains a hot bar. Participants in the main line plan may choose a no-flesh/vegetarian option, where inmates self-select vegetarian items from the hot bar. The Common Fare meals are kosher meals. Common Fare participants may not select items from the hot bar, but they may supplement their diets by selecting items from the salad bar or by purchasing items from the commissary.

> The BOP decided to serve kosher meals in the Common Fare plan after reviewing the dietary requirements of various religious faiths. It concluded that a kosher meal was the strictest diet and subsumed all other religious dietary needs. Local prisons may not make changes to the Common Fare plan; such changes must occur pursuant to the BOP's direction, not at individual prisons.

*Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 810 (8th Cir. 2008) (footnote omitted).

Under the BOP's religious diet program, "[i]nmates participating in the ['Common Fare'] Component are not authorized to consume mainline or hot bar food items; however, they may consume items from a salad bar (where salad bars are part of the Food Service program), knowing that salad bar items may not meet their religious dietary needs." Fed.

Bureau of Prisons, Program Statement P4700.06, Food Service Manual 23–24 (Sept. 13, 2011), *available at* http://www.bop.gov/policy/progstat/4700_006.pdf. If an inmate on the common fare plan violates the dietary restrictions of that program, he may be removed from the plan and temporarily disqualified from participating in it for up to thirty days, or for up to one year if the inmate has repeatedly withdrawn or been removed from the plan. *See* 28 C.F.R. § 548.20(b); Fed. Bureau of Prisons, Program Statement P5360.09, Religious Beliefs and Practices 19 (Dec. 31, 2004) (hereinafter, "BOP Program Statement P5360.09"), *available at* http://www.bop.gov/policy/progstat/5360_009.pdf.

Prior to his arrival at USP Lewisburg, Njos had been removed from the common fare plan on three occasions.[3] On November 24, 2010, Njos purchased a non-kosher beef summer sausage from the commissary. On December 2, 2010, after learning of that purchase, Njos was removed from the common fare plan by Chaplain Caudle pursuant to 28 C.F.R. § 548.20(b), based on Njos's purchase of non-kosher food.[4] Because this was his fourth such removal, Njos was temporarily disqualified from participation in the certified religious diet program for a period of one year, after which he could reapply for admission into the program.

---

[3] Njos claims in his response to the motion for summary judgment that he was not removed for violations, but voluntarily withdrew from the common fare plan on all three occasions because he is allergic to fish and the only meat being served on the common fare menu at the time was fish. None of this is material, however, as the pertinent federal regulation and BOP policy permit disqualification for up to one year based on repeated withdrawals or removals from the program, whether they are voluntary or not. *See* 28 C.F.R. § 548.20(b); BOP Program Statement P5360.09, at 19.

[4] Njos has contended, both in correspondence with the prison chaplains and in his pleadings and motion papers in this Court, that it is his personal religious belief that he may consume non-kosher meat on occasions of "formidable oppression," provided it is not pork and he first makes a prayer to God that it be cleansed and blessed.

In March 2011, Njos requested reinstatement to the common fare plan, which was denied by Chaplain Carney based on Njos's one-year suspension from the program. Three months later, Njos again requested reinstatement to the common fare plan. In July 2011, Njos was interviewed for participation in the religious diet program, and he was denied the common fare diet but approved by Chaplains Jones and Caudle to participate in the mainline religious diet program. On the mainline religious diet plan, Njos was required to provide for his religious dietary needs by self-selection from the ordinary mainline food service, which included vegetarian options, but not kosher food.

Njos was re-interviewed in January 2012, January 2013, and July 2013 by Chaplains Onuh, Carney, and Davis, respectively. Each time, Njos requested reinstatement to the common fare plan, and each time he was denied the common fare diet but approved to participate in the mainline religious diet program.

With respect to juice and matzo, on March 14, 2012, Njos wrote to Chaplain Carney to request matzo and kosher grape juice for use in his Sabbath evening religious service. On March 16, 2012, Chaplain Carney responded in writing, requesting that Njos explain the significance of his request for matzo and juice. On March 20, 2012, Njos wrote to Carney to explain that consumption of the juice and matzo were required in connection with a "Kiddush" prayer to be recited before Friday evening, Saturday morning and Saturday evening meals. On March 22, 2012, Carney responded "[r]equest denied," having determined that the reasons offered by Njos were not consistent with the Jewish faith. Nevertheless, Njos began receiving one 6.75-ounce container of kosher grape juice and two pieces of matzo for his Friday evening Kiddush prayer. On April 30, 2012, Njos wrote to Chaplain Davis to request additional juice and matzo for use on Saturday morning and

Saturday evening, noting that Jewish law requires a minimum of three ounces of kosher wine or grape juice and two pieces of matzo be consumed with each recitation of Kiddush. Later that same day, Chaplain Carney responded in writing: "This is not consistent w/ Sabbath practice."

Njos filed the complaint in this action on July 17, 2012. (Doc. 1). On November 8, 2012, several claims and defendants were dismissed pursuant to 28 U.S.C. § 1915(e)(2), but the case was permitted to proceed with respect to Njos's First Amendment and RFRA claims against the three chaplains. On March 19, 2013, the Defendants filed a motion to dismiss or for summary judgment. (Doc. 21). On April 1, 2013, the Defendants filed a brief, a statement of material facts, and various exhibits in support of the motion. (Doc. 22; Doc. 23; Doc. 22-1). On June 17, 2013, Njos filed his response in opposition to the motion. (Doc. 31). The motion is now ripe for decision on the papers. Fed. R. Civ. P. 78(b); L.R. 7.9.

## II.  SUMMARY JUDGMENT STANDARD

The Defendants move both to dismiss pursuant to Rule 12(b)(6) and for summary judgment pursuant to Rule 56. This Court has previously passed on the sufficiency of the complaint under Rule 12(b)(6) with respect to these three defendants. *See Njos v. Carney*, No. 3:12-CV-1375, 2012 WL 5463097 (M.D. Pa. Sept. 12, 2012) (Doc. 8), *adopted by* 2012 WL 5463202 (M.D. Pa. Nov. 8, 2012) (Doc. 11). Moreover, the Defendants have presented and liberally relied upon factual materials outside the complaint. (Doc. 22-1; Doc. 23). Therefore, the instant motion will be treated as one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

## III. DISCUSSION

The Defendants move for summary judgment on several grounds. First, with respect to the First Amendment claim, they argue that their actions were reasonably related to legitimate penological interests, and therefore did not violate the First Amendment. Next, with respect to the RFRA claim, they argue that their actions did not impose a substantial burden on Njos's exercise of religion. Finally, they argue that the chaplains are entitled to qualified immunity.

### A. First Amendment Claim

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Although Njos is incarcerated, the Supreme Court has made it clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted). But "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone*, 482 U.S. at 348. "Thus, a prison inmate 'retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (en banc) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *see also Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) ("[R]easonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First . . . Amendment without fear of penalty.").

As a threshold matter, "[t]he mere assertion of a religious belief does not automatically trigger First Amendment protections . . . . To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *DeHart*, 227 F.3d at 51. "Thus, if a prisoner's request . . . is *not* the result of

sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request . . . ." *DeHart*, 227 F.3d at 52. But "a religious practice is protected even if it is not deemed to be mandatory or practiced by every member of the religion." *Daley v. Lappin*, ___ Fed. App'x ____, 2014 WL 306932, at *2 (3d Cir. 2014); *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 171 (3d Cir. 2002) (holding that whether religious practices at issue are "mandatory" or "optional" is irrelevant, as the religious beliefs merely need be "sincerely held"); *DeHart*, 227 F.3d at 56 ("It would be inconsistent with a long line of Supreme Court precedent to accord less respect to a sincerely held religious belief solely because it is not held by others.").[5]

The Defendants do not dispute that adherence to a kosher diet and the recitation of Kiddush prayer, accompanied by the consumption of a small quantity of wine or juice and matzo, are religious in nature. *See, e.g.*, *Johnson v. Horn*, 150 F.3d 276, 279 (3d Cir. 1998) (adherence to kosher diet is a religious exercise), *overruled on other grounds by DeHart*, 227 F.3d at 54–55; *Sample v. Lappin*, 424 F. Supp. 2d 187, 192–93 (D.D.C. 2006) (consumption of wine in connection with recitation of Kiddush is a religious exercise). Although the Defendants may have reasonably doubted the sincerity of Njos's religious beliefs in light of his repeated requests to change his official religious affiliation and his purchase of non-kosher food from the prison commissary, *see, e.g.*, *Berryman v. Granholm*, Civil Action No.

---

[5] This threshold requirement of a "sincerely held religious belief" applies to Njos's RFRA claim as well, as RFRA is merely a legislative re-imposition of strict scrutiny review to First Amendment free exercise rights. *See Daley*, 2014 WL 306932, at *2 (citing *Ford v. Bureau of Prisons*, No. 3:CV-12-0873, 2013 WL 5603587, at *5 (M.D. Pa. Oct. 11, 2013)); *see also Daley* at *3 ("Congress enacted RFRA to 'restore the compelling interest test' applied to First Amendment Free Exercise claims.") (quoting *Sossamon v. Texas*, 131 S. Ct. 1651, 1656 (2011)). The Plaintiff having satisfied this threshold requirement here, it will be omitted from the RFRA discussion below.

06-CV-11010-DT, 2007 WL 2259334, at *3 (E.D. Mich. Aug. 3, 2007), they stop short of advocating summary judgment on this threshold issue, and the only evidence offered on this point is Chaplain Carney's personal and conclusory opinion that the sincerity of Njos's religious beliefs is questionable. (Doc. 22-1, at 15). Accordingly, for the purpose of the instant summary judgment motion, the Court must accept Njos's declaration that his religious beliefs are sincerely held. (Doc. 31, at 7–10).

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court of the United States articulated the standard for reviewing a prison regulation challenged on constitutional grounds. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. *Turner* identified the following four factors for a court to consider in assessing the ultimate reasonableness of a prison regulation:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*DeHart*, 227 F.3d at 51 (internal quotation marks and alterations omitted).

As the Third Circuit has observed, *Turner* did not expressly state which party bears the burden of proving each of these four factors. *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012). Thus, the Third Circuit has developed a two-step, burden-shifting analysis under *Turner*:

> First, the prison has the burden of demonstrating the First *Turner* Factor. This burden is slight, and in certain instances, the connection may be a matter of common sense. Second, if the prison meets its burden under the First *Turner* Factor, then we consider the [Second, Third, and Fourth] *Turner* Factors.

*Sharp*, 669 F.3d at 156.

Although the prisoner-plaintiff bears the "ultimate burden of persuasion with regard to the reasonableness of a regulation," the prison is first required to "put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters could rationally have seen a connection between the policy and that interest." *Sharp*, 669 F.3d at 156 (quoting *Jones v. Brown*, 461 F.3d 353, 360–61 (3d Cir. 2006) (alterations omitted)).

### 1. The First *Turner* Factor

The First *Turner* Factor is the existence of "a valid, rational connection between the prison regulation and the legitimate governmental interest." *DeHart*, 227 F.3d at 51. "A prison regulation fails this prong if it promotes an interest that is illegitimate or not neutral, or . . . bears no valid, rational connection to the asserted interest." *Fraise v. Terhune*, 283 F.3d 506, 516 (3d Cir. 2002). As noted above, the Defendants bear the burden of coming forward with the requisite legitimate governmental interest. "This burden, though slight, must amount to more than a conclusory assertion." *Jones*, 461 F.3d at 360.

With respect to Njos's disqualification from the certified religious diet plan following his purchase of non-kosher food at the prison commissary, the relevant regulations are 28 C.F.R. § 548.20 and BOP Program Statement P5360.09. By their terms, these regulations state that the BOP's religious diet program is formulated with "the constraints of budget limitations and the security and orderly running of the institution and the [BOP]" in mind. 28 C.F.R. § 548.20(a); BOP Program Statement P5360.09, at 19. The Declaration of

Chaplain Carney reiterates these institutional interests. (Doc. 23, at 7). This satisfies the Defendants' "slight burden" under the First *Turner* Factor with respect to Njos's disqualification from the certified religious diet plan. *See generally DeHart*, 227 F.3d at 53 (legitimate penological interest in efficient food system); *Johnson*, 150 F.3d at 282 (legitimate penological interest in keeping prison food service system as simple as possible). Thus the First *Turner* Factor favors the Defendants with respect to Njos's certified religious diet plan claim.

With respect to the Defendants' refusal to provide Njos with the requested amount of kosher grape juice and matzo for use in Sabbath rituals, the Defendants have failed to identify any penological interests whatsoever. It is not addressed in the Defendants' statement of material facts, their briefs, nor their supporting exhibits. The relevant regulation would appear to be BOP Program Statement P5360.09, which provides that: "Chaplains will provide opportunities for individuals to receive the sacraments and sacred rituals in SHUs. This includes, but is not limited to, communion and Sabbath prayer items — matzo and grape juice." BOP Program Statement P5360.09, at 7. But the program statement does not identify any related penological interest, nor does it impose any specific limit on the quantity of Sabbath prayer items. In the absence of a proffered penological interest to support Chaplain Carney's refusal to provide the requested quantities of kosher grape juice and matzo, summary judgment with respect to this claim is inappropriate. *See Sharp*, 669 F.3d at 156; *Jones*, 461 F.3d at 360.

### 2.  The Second *Turner* Factor

The Second *Turner* Factor is "whether [Njos] retain[s] alternative means of exercising the circumscribed right." *DeHart*, 227 F.3d at 51. "[T]he 'right' which is being

circumscribed is [the] right to free religious expression." *DeHart*, 227 F.3d at 54. As a result, under the second *Turner* factor, the Court must inquire whether Njos has "alternative means of exercising his [Jewish] beliefs generally (*e.g.*, by prayer, worship, meditation, scripture study, etc.)." *DeHart*, 227 F.3d at 54.

> [W]here a prison regulation limits an inmate's ability to engage in a particular religious practice, the second prong of *Turner* requires an examination of whether there are other means available to the inmate for expressing his religious beliefs. If the prison does afford the inmate alternative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable.

*DeHart*, 227 F.3d 47, 57 (3d Cir. 2000).

It appears from the record that Njos has limited alternative means of exercising his right to free religious expression. He is apparently free to pray and study scripture.[6] The Defendants suggest that Njos can also self-select vegetarian fare from the mainline food services and supplement his diet through commissary purchases, but Njos disputes both of these points, and the Court must resolve this fact dispute in Njos's favor on summary judgment. On this scant record, the Second *Turner* Factor favors Njos with respect to his certified religious diet plan claim.

### 3.   The Third and Fourth *Turner* Factors

The Third *Turner* Factor is "the costs that accommodating the right would impose on other inmates, guards, and prison resources generally." *DeHart*, 227 F.3d at 51. The Fourth *Turner* Factor is "whether there are alternatives to the regulation that fully accommodate the

---

[6] In his declaration, Njos acknowledges his daily study of Jewish faith and history. (Doc. 31, at 7). It is also clear that he has the opportunity to recite the Kiddush prayer and consume the customary quantities of juice and matzo once per week, but Njos contends that this his ability to perform the appropriate Kiddush prayer is significantly limited insofar as his religious beliefs require him to recite Kiddush three times per week, rather than once.

prisoner's rights at de minimis cost to valid penological interests." *DeHart*, 227 F.3d at 51. The parties fail to identify any evidence of record as to these factors. In light of the widespread accommodation of the dietary needs of Jewish inmates throughout the federal prison system, pursuant to a uniform national standard menu, the impact on prison resources or interests of permitting Njos to participate in the common fare plan appears to be de minimis, as compared with the mainline plain. *See DeHart*, 227 F.3d at 58–59. Thus the Third and Fourth *Turner* Factors favor Njos with respect to his certified religious diet plan claim.

### 4.  Balancing the *Turner* Factors

"*Turner* does not call for placing each factor in one of two columns and tallying a numerical result." *DeHart*, 227 F.3d at 59. "[T]he First Amendment requires [prison officials] to provide [Jewish inmates] with a diet sufficient to sustain them in good health without violating the kosher laws." *Johnson*, 150 F.3d at 283. But where "other avenues remain available for the exercise of the inmate's religious faith, courts should be particularly conscious of the measure of judicial deference owed to correction officials." *DeHart*, 227 F.3d at 59 (quoting *Turner*, 482 U.S. at 90, and *Pell v. Procunier*, 417 U.S. 817, 827 (1974)) (internal quotation marks and alterations omitted); *see also Johnson*, 150 F.3d at 283 ("[E]ach prison should receive substantial deference in formulating its particular plan for dietary accommodation."). Thus, the BOP "is fully permitted to create the diet it believes best serves its legitimate penological interests as long as that diet (1) is kosher, and (2) sustains [Jewish inmates] in good health." *Johnson*, 150 F.3d at 283.

Notwithstanding the substantial deference this Court is prepared to give to prison officials in creating an appropriate religious diet program for inmates such as this one, the

Defendants have failed to place any evidence into the record to indicate that a nutritionally adequate kosher diet may be obtained from the mainline religious diet plan, whether by self-selection from salad and hot bars, or by supplementation through commissary purchases. Although Chaplain Carney's declaration clearly states that the meals provided under the *certified religious diet plan* are nutritionally adequate and kosher, it says absolutely nothing about the food available under the mainline religious diet plan.[7] (Doc. 22-1, at 14). In the absence of such evidence in the record, this Court is unable to conclude as a matter of law that the ongoing disqualification of Njos from participating in the certified religious diet plan is a reasonable restriction imposed on Njos's religious expression.[8]

Accordingly, viewing the evidentiary record, and the reasonable inferences therefrom, in the light most favorable to Njos, the Defendants are not entitled to summary judgment with respect to Njos's First Amendment claim at this time.

## B. RFRA CLAIM

Under RFRA, the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person . . . is in furtherance of a compelling interest; and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

---

[7] Meanwhile, Njos has explicitly disputed the availability of kosher food via the mainline food service, particularly in light of his alleged food allergies, and he has noted that he is not able to supplement his diet through commissary purchases due to a commissary restriction, as well as its limited selection. (Doc. 31, at 3–4).

[8] In essence, the Defendants have failed to make a *prima facie* showing that they are entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

"The plaintiff has the burden of establishing the elements of a prima facie case: that application of the offensive law or policy would substantially burden a sincere, religious exercise." *Conestoga Wood Specialties Corp. v. Sebelius*, 917 F. Supp. 2d 394, 410 (E.D. Pa. 2013); *Rogers v. United States*, 696 F. Supp. 2d 472, 486–87 (W.D. Pa. 2010). "Once a prima facie case has been satisfied, the government bears the burden of demonstrating a compelling interest and that the government employed the least restrictive means in carrying out that interest." *Conestoga Wood*, 917 F. Supp. 2d at 410; *Rogers*, 696 F. Supp. 2d at 487.

For the purposes of RFRA,

> a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Daley*, 2014 WL 306932, at *3 (quoting *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007)).

Njos claims that the Defendants "substantially burdened" his exercise of Judaism by: (1) removing him from and refusing to reinstate him to a kosher religious diet program; and (2) providing him with inadequate amounts of juice and matzo for use in Sabbath rituals.

The initial disqualification of Njos from the common fare plan in December 2010 does not constitute a substantial burden on Njos's exercise of Judaism. For one, suspension of a federal inmate from the certified religious diet plan pursuant 28 C.F.R. § 548.20(b) for the purchase or consumption of non-kosher food does not substantially burden a religious exercise because (a) the prohibited conduct is not religiously motivated, and (b) the regulation does not compel conduct contrary to the inmate's religious beliefs. *Daly v. Davis*, No. 08-2046, 2009 WL 773880 (7th Cir. Mar. 25, 2009). Moreover, a *temporary* suspension

of an inmate's participation in a meal program that caters to his religious needs does not constitute a *substantial* burden on the inmate's religious exercise. *See Berryman*, 2007 WL 2259334, at *3; *see also Berryman*, 2007 WL 2259334, at *1 n.2 (program permitted suspension up to one year for second or subsequent offense of eating or purchasing non-kosher food).

The Defendants' ongoing refusal to reinstate Njos to the common fare plan, however, may constitute a substantial burden on his free exercise of religion. Denial of a kosher diet to an inmate who fails to demonstrate a sufficient understanding of Judaism to warrant a kosher diet does not constitute a substantial burden. *See Schuh v. Mich. Dep't of Corr.*, No. 1:09-CV-982, 2011 WL 4529641, at *2 (W.D. Mich. Sept. 30, 2011). Denial of a special kosher diet to an inmate when vegetarian options are available likewise does not constitute a substantial burden. *See Perez v. Frank*, No. 04-C-1062, 2008 WL 859716, at *6 (E.D. Wis. Mar. 28, 2008). But there is no evidence in the record to suggest that Njos has failed to demonstrate such an understanding of Judaism, and, as noted above, there is no evidence in the record to demonstrate that a nutritionally adequate kosher vegetarian diet can be obtained from self-selection from mainline food services. Moreover, the complete denial of a common fare diet to an inmate who cannot be accommodated by the regular prison menu, supplemented by commissary purchases, has been held to constitute a substantial burden. *Blount v. Fleming*, 2006 WL 1805853, at *14 (W.D. Va. June 29, 2006). Thus, the record reflects a genuine dispute of material fact with respect to whether placement of Njos on the mainline religious diet plan is sufficient to provide him with a nutritionally adequate kosher diet.

The Defendants' refusal to provide Sabbath prayer items — kosher grape juice and matzo — in amounts sufficient to permit Njos to recite Kiddush on all three weekly occasions likewise appears to be a substantial burden. *See Sample*, 424 F. Supp. at 194 (denial of Kiddush wine constituted substantial burden). Here, Njos claims that his religious beliefs, the sincerity of which is not contested on summary judgment, require him to recite a Kiddush prayer before meals on Friday evening, Saturday morning, and Saturday evening. Njos further claims that Jewish law requires that he consume a minimum of three ounces of kosher grape juice and two pieces of matzo each time he recites the Kiddush prayer. Rather than the nine ounces of juice and six pieces of matzo he has requested for this purpose, he has been provided with 6.75 ounces of juice and two pieces of matzo. The Defendants have placed no evidence into the record to suggest otherwise.

Even if the Court assumes a substantial burden was imposed, the Defendants can escape liability if they can "demonstrate[e] a compelling interest and that the government employed the least restrictive means in carrying out that interest." *Conestoga Wood*, 917 F. Supp. 2d at 410; *Rogers*, 696 F. Supp. 2d at 487. However, the Defendants have made no effort to do so. Their brief addresses the substantial burden issue only. Moreover, having already determined that the Defendants' motion for summary judgment fails under the comparatively less stringent "reasonable relation" test under the First Amendment, it must also be concluded that the Defendants have failed to satisfy the heightened scrutiny of RFRA's "compelling interest" test. *See Blount v. Johnson*, 2006 WL 542600, at *7 (W.D. Va. Mar. 2, 2006).

Accordingly, viewing the evidentiary record, and the reasonable inferences therefrom, in the light most favorable to Njos, the Defendants are not entitled to summary judgment with respect to Njos's RFRA claim at this time.

### C. QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interest — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp*, 669 F.3d at 159 (citing *Pearson*, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571 F.3d 318, 325–26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier*

prongs should be addressed first). As discussed above, viewing the facts in the light most favorable to him, Njos has alleged the violation of a federal constitutional or statutory right. But the Defendants may nevertheless prevail on summary judgment with respect to Njos's damages claims under the second prong of the *Saucier* analysis.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "In determining whether a right has been clearly established, the court must define the right allegedly violated at the appropriate level of specificity." *Sharp*, 669 F.3d at 159. "In some cases, even though there may be no previous precedent directly on point, an action can still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with obvious clarity." *Sharp*, 669 F.3d at 159. "When reviewing a qualified immunity defense, courts should examine their own *and* other relevant precedents." *Williams v. Bitner*, 285 F. Supp. 593, 604 n.15 (M.D. Pa. 2003) (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)).

The violations of constitutional and federal rights alleged in this case initially occurred in December 2010 and continue into the present. Under both the First Amendment and RFRA, "[t]he right of a prisoner to a diet consistent with his religious beliefs (unless refusal to provide such a diet is reasonably related to legitimate penological interests) was clearly established well before [2010]." *Jupiter v. Johnson*, No. 3:10-CV-01968, 2011 WL 4527803, at *15 (M.D. Pa. Apr. 26, 2011) (citing *DeHart*, 227 F.3d at 51, and *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992)); *see also Lovelace v. Lee*, 472 F.3d 174, 198–99 (4th Cir. 2006); *Love v. Reed*, 216 F.3d 682, 689 (8th Cir. 2000); *LeFevers v. Saffle*, 936 F.2d 1117,

1119 (10th Cir. 1991); *Rogers*, 696 F. Supp. 2d at 503; *Shaheed-Muhammad v. Dipaolo*, 393 F. Supp. 2d 80, 100 (D. Mass. 2005). On this point, the Defendants simply argue that their decisions were in accordance with the discretionary duty imposed on them by BOP Program Statement P5360.09 to determine whether Njos's religious beliefs were sincerely held, and thus their exercise of this discretion was *ipso facto* reasonable. But with one exception,[9] the only evidence of record with respect to these discretionary decisions by the Defendants is their summary denials of Njos's requests. (Doc. 22-1, at 51; Doc. 22-1, at 54; Doc. 22-1, at 60; Doc. 22-1, at 64; Doc. 22-1, at 70; Doc. 22-1, at 74). These summary denials provide no evidence whatsoever that any of these various rejections of Njos's requests was a reasonable exercise of a chaplain's discretion under BOP Program Statement P5360.09. Moreover, the propriety or reasonableness of a particular "sincerity test" is immaterial — the salient issue under the "clearly established" prong of *Saucier*'s qualified immunity analysis is whether it is clearly established that inmates are entitled to religious

---

[9] With respect to Njos's request for additional kosher grape juice and matzo, Chaplain Carney's declaration augments his summary written denial with a *post hoc* explanation that he denied the request because Njos's "reasons for the request were not consistent with the Jewish faith." (Doc. 22-1, at 15). But the federal courts have long rejected the notion that the First Amendment (and RFRA) protect only those religious beliefs that are consistent with those of organized religious authorities. *See Nelson v. Miller*, 570 F.3d 868, 878–79 (7th Cir. 2009); *Jackson v. Mann*, 196 F.3d 316, 320–21 (2d Cir. 1999); *Riley v. Beard*, No. 3:09-CV-230, 2011 WL 3273069, at *6 (M.D. Pa. July 29, 2011). The operative question here is whether Njos's personal religious beliefs are "sincerely held," not the "ecclesiastical question" of whether they are consistent with the tenets and practices of any established sect of Judaism. *Vinning-El v. Evans*, 657 F.3d 591, 595 (7th Cir. 2011); *Jackson*, 196 F.3d at 320–21; *Riley*, 2011 WL 3273069, at *6.

dietary accommodations absent a legitimate reason to the contrary, which it most certainly is. *Wall v. Wade*, ___ F.3d ____, 2014 WL 350636, at *7 (4th Cir. 2014).[10]

The current record does not support the Defendants' claim of qualified immunity. Njos's right to a diet consistent with his religious beliefs was clearly established at the time of the violations alleged in his complaint. The Defendants have failed to identify or place into the record sufficient evidence to support their contention that the restrictions placed on Njos's religious diet were reasonable under the *Turner* standard. Therefore, summary judgment cannot be granted on that basis. *See Riley v. Beard*, No. 3:09-CV-230, 2011 WL 3273069, at *6 (M.D. Pa. July 29, 2011).

Accordingly, viewing the evidentiary record, and the reasonable inferences therefrom, in the light most favorable to Njos, the Defendants are not entitled to summary judgment with respect to their qualified immunity defense at this time.

## IV. RECOMMENDATION

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment (Doc. 21) be **DENIED without prejudice** to filing a subsequent motion for summary judgment after discovery has been taken; that the Defendants be directed to file their answer within fourteen days after the Court's order, s*ee Fed. R. Civ. P. 12(a)(4)*; and

---

[10] An ancillary consideration that militates in favor of denying summary judgment on qualified immunity at this early stage is the fact that even if Njos's damages claims were to be dismissed on summary judgment, he has requested injunctive relief and thus the case would continue against these defendants in their official capacities in any event. *See Hunafa v. Murphy*, 907 F.2d 46, 48 (7th Cir. 1990) ("In [such a] case at least it is better to wait and allow a more complete record to be compiled before attempting to decide whether the defendants can be held liable in damages.").

that this matter be remanded to the undersigned Magistrate Judge for further pre-trial proceedings.

BY THE COURT:

Dated: **February 19, 2014**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

SCOTT NJOS,

                Plaintiff,             |    CIVIL ACTION NO. 3:12-CV-01375

      v.                         |            (KOSIK, J.)
                               |    (MEHALCHICK, M.J.)

CARNEY, et al.,

                Defendants.   |

### NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **February 19, 2014**. Any party may obtain a review of

the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: February 19, 2014**

                             *s/ Karoline Mehalchick*
                             **KAROLINE MEHALCHICK**
                             **United States Magistrate Judge**